# MACFARLAND *v.* BARBER ASPHALT PAVING COMPANY.

CONTRACTS; MUNICIPAL CORPORATIONS; STREET PAVEMENTS.

1. Where a party by his own contract creates a duty or obligation possible of fulfilment, he must make good his undertaking, unless prevented from so doing by the act of God, the law, or the other party. The law will not presume that the happening of a subsequent contingency resulting in loss was not considered when the contract was entered into.

2. Where a street pavement consisting of material injuriously affected by escaping gas is laid on soil containing an abnormal amount of moisture and over gas mains subject to leakage, under a municipal contract which requires the contractor to keep the pavement in repair for five years, and provides that no allowance shall be made to the contractor for any unusual difficulties that may arise, "either affecting the original construction or maintenance of finished work," and that if, "for any reason whatsoever," within that period the pavement shall prove inferior, in the judgment of the municipal engineer officer, the contractor shall relay it with new and approved material,—it is the duty of the contractor, and not of the municipality, to make repairs within the five years, made necessary by damage to the pavement caused by moisture from the soil and gas escaping from the mains.

3. Where, under a municipal contract for paving a street, the municipality has the right to require the contractor either to relay the pavement or to repair it, in event it proves inferior, the contractor has no cause to complain if the municipality waives its right to require him to relay the pavement, and merely requires him to repair it.

No. 1728.    Submitted March 20, 1907.    Decided May 7, 1907.

HEARING on an appeal by the defendants, the Commissioners of the District of Columbia and the Treasurer of the United States, from a decree of the Supreme Court of the District of

Columbia in favor of the complainant in a suit in equity to establish its right to balances claimed to be due on certain contracts with the District of Columbia for paving streets.

*Reversed.*

The COURT in the opinion stated the facts as follows:

Appeal from a decree of the supreme court of the District.

This suit involves the construction of two contracts for paving M street, in Georgetown, between 31st and 36th streets, and which were entered into by the District authorities with the Barber Asphalt Paving Company September 16, 1896, and August 19th, 1897, respectively.

The contracts contain the following stipulations: "The attention of bidders is invited to the clause of the current appropriation bill (30 Stat. at L. 530, chap. 540) which says 'that under appropriations contained in this act no contract shall be made for making or repairing concrete or asphalt pavement at a higher price than $1.80 per square yard for a quality equal to the best laid in the District of Columbia prior to July 1st, 1886, and with same depth of base; Provided, That these conditions as to price and depth of base shall not apply to those streets on which, in the judgment of the Commissioners, by reason of heavy traffic, poor foundation, or other causes, a pavement of more than ordinary strength is required, in which case the limit of price may be increased to $2 per square yard.' "

Reference is also made in the contracts to the act providing for a permanent form of government for the District of Columbia (20 Stat. at L. 102, chap. 180), which provides:

"No pavement shall be accepted, nor any pavement laid, except that of the best material of its kind known for that purpose, laid in the most substantial manner; and good and sufficient bonds to the United States, in a penal sum of not less than the amount of the contract, with sureties to be approved by the Commissioners of the District of Columbia, shall be required from all contractors, guarantying that the terms of their contracts shall be strictly and faithfully performed to the satisfaction

of and acceptance by said Commissioners; and that the contractors shall keep new pavements or other new works in repair for a term of five years from the date of the completion of their contracts; and 10 per cent of the cost of all new works shall be retained as an additional security and a guaranty fund to keep the same in repair for said term, which said per centum shall be invested in registered bonds of the United States or of the District of Columbia, and the interest thereon paid to said contractors."

The above references are supplemented with the following:

"The bidder is expected to examine the site before bidding, as no allowance will be made for any unusual difficulties which may arise, either affecting the original construction or maintenance of the finished work."

The "guaranty" provisions of the contracts are as follows:

"Guaranty.—All payments [pavements] and other work will be guaranteed and kept in repair by the contractor without cost to the District for a period of five years from date of its acceptance by the Commissioners. The date of the acceptance will be the date of the final voucher. Ten per cent of the cost of this work will be retained and disposed of as otherwise provided for herein.

"It is further expressly understood and agreed that if any of the pavements laid should, for any reason whatsoever, within the period of five years, prove inferior to the best laid in the District prior to July 1, 1886, then the contractor shall, on demand of the Commissioners, remove such defective pavements and relay them with new material of approved quality and in accordance with these specifications. The engineer commissioner shall decide the question of inferiority.

"On expiration of the guaranty for maintenance, the work is to be inspected, and all imperfections, depressions, and unevenness of surface, alignment, and grade of curbs, sidewalks, etc., also cracks, rolls, breaking up of wearing or cushion coat of concrete base on asphalt pavement or sidewalk, must be corrected where and to such an extent as the engineer commissioner shall direct; upon which the engineer commissioner will ac-

cept the same in writing; and until such acceptance the guarantee shall be in force."

The specifications attached to the contracts provide in detail for the work to be done thereunder, but need not be repeated here, as no contention is made that the work was not done in accordance with the specifications.

Work under the first contract was completed about January 5, 1897, and payment was made therefor, 10 per cent being deducted in accordance with the reservation in the contract. This sum, $10,297.55, was duly deposited with the Treasurer of the United States, ex-officio commissioner of the District of Columbia sinking fund, and by him invested in bonds as directed by law. The second contract was completed about January 5, 1898, and payment made therefor, less 10 per cent retent, amounting to $3,829.82, which was also deposited with the Treasurer of the United States.

In January, 1898, shortly after the completion of the pavement by the asphalt company, the Capital Traction Company laid temporary tracks thereon, and the attention of the commissioners was thereupon directed to this fact by the superintendent of the asphalt company, who claimed that injury to the pavement might or would result therefrom. In about three years thereafter the pavement began to disintegrate, and at the end of the guaranty period a large portion of it was disintegrated, uneven, and badly out of repair. On January 14, 1902, the guaranty period under the first contract being about to expire, the superintendent of the asphalt company again wrote the Commissioners directing their attention to the defective pordition of the pavement, and to the fact that the defective portions were "almost entirely confined to the portions occupied by the temporary tracks during the reconstruction of the railway, in 1898." Thereupon the inspector of asphalt and cements for the District, in company with the superintendent of the asphalt company, made an examination of the pavement, and the conclusion was then reached by the inspector for the District that the condition of the pavement was due to the action of water and illuminating gas. The asphalt company was then

called upon to replace the .portions of the pavement laid under the first contract, that were disintegrated and out of repair, and upon the refusal and neglect of the asphalt company to comply with said notice the District made the repairs at a cost of $1,991.77.

The Commissioners then notified the asphalt company that, in accordance with the provisions of the contracts, they would seek reimbursement for the amount thus paid for repairs on said street out of the $10,297.55 retent. The asphalt company thereupon filed its bill, the third and fourth paragraphs of which are as follows:

"3. The complainant duly performed all the work required of it under said contract. The five-year term referred to in the foregoing provision expired on the 19th day of January, 1902. At that time the Commissioners of said District, on behalf of said District, accepted all the pavements laid under said contract as being in good condition and order, and no question or difference has arisen between the complainant and said Commissioners in regard thereto, except as to the pavement laid as aforesaid by the complainant on said M street said Commissioners called upon the complainant to repair the same, and at the same time informed the complainant that if such repairs were not promptly made by the complainant the work would be undertaken by said District, and the cost thereof charged to your complainant.

"4. After the pavement of said parts of M street has [had] been laid by the complainant under said contract, and before the expiration of the five years from the date of the acceptance thereof by the Commissioners of said District, the Commissioners of said District authorized the Capital Traction Railway Company, a corporation which operates by electric power street cars on M street, to spike down on said pavements certain temporary railroad tracks, and to run their cars over said temporary tracks for a period of several weeks. Said pavement was greatly injured and deteriorated by this means. And said pavement during said five years' period, through the negligence either of the Georgetown Gaslight Company, a corporation

which furnishes illuminating gas to residences and places of business in said city through underground pipes or conduits under the streets thereof, or through the negligence of said Commissioners, or their subordinates, was further injured by being permeated by illuminating gas which escaped through some of said pipes or conduits for a period of several years immediately preceding the expiration of said five-year term; the injury done to said pavement by the means last mentioned being so great that at the end of the said five-year term considerable portions of said pavements were practically disintegrated. And the complainant says that but for the injuries caused, as aforesaid, by the laying of said temporary railway tracks and by said pavement being permeated with gas, said pavement at the end of said five-year period would have been in perfect condition, and that all the defects which existed in it when said five-year period expired were due wholly to said causes, and not to any defect either in the composition of the pavement when it was laid, or in the manner in which it was laid, or for any other cause for which the complainant was responsible, or which it had power to prevent."

In the fifth paragraph of the bill it is stated that "when said Commissioners gave said notification to repair the pavement on said street, the complainant, through its counsel, informed said Commissioners of the foregoing facts, and declined, for the reasons above set forth, to repair said pavement, as required by said notification. Thereafter said Commissioners caused said pavement to be repaired, and notified the complainant that the expense of such repairs was $1,991.77."

The bill concludes with a prayer for an order restraining the selling of the bonds in which said retent had been invested, and restraining the reimbursement of the Commissioners of the District for the cost of said repairs, and asking for the appointment of a receiver to take charge of said bonds. There is also a prayer that "so much of the same (10 per cent retent) as may not be required to protect said District as to its said claim of nineteen hundred and ninety-one dollars and seventy-seven cents ($1,991.77) may be delivered to the complainant."

A preliminary restraining order issued, and shortly thereafter the court directed the Treasurer of the United States, as commissioner of the sinking fund of the District, to hold, until further order of the court, $2,500 of the retent under said first contract, and to deliver the balance of said retent to said asphalt company, all of which was done.

Upon the expiration of the five years' period under the second contract the same proceedings were had, and a supplemental bill was filed embracing said contract, but no restraining order was issued, the result being that the Treasurer of the United States, who held $3,829.82 retent under that contract, paid the District $1,847.94, the amount expended in repairs under said second contract.

Testimony was taken and a hearing had, which resulted in a decree in favor of the complainant, the decree being made without prejudice to the right of the complainant to the sum turned over to the District by the Treasurer under the second contract.

It is not necessary to give more than a brief synopsis of the evidence.

Before these contracts were entered into, M street between 31st and 36th streets was paved with granite blocks, and therefore the laying of asphalt pavement on that portion of the street was in the nature of an experiment. The street at that point is on the side of a hill which rises quite sharply above the street. It is also a fact that there is an abnormal amount of moisture in the ground at that point. There were gas mains under the street when the paving contracts were entered into, one of which, at least, had been there for many years, but no mains were laid during the life of said contract. Several permits, however, were obtained by the gas company, during the five years' guaranty period, to repair leaks in its mains under or adjacent to the portion of the street involved in this suit; but neither the District nor the asphalt company discovered any evidence of gas in the pavement until after the guaranty period under the first contract had expired, although Mr. Richards, the superintendent of the asphalt company, who was skilled in the art, and who was familiar with the effect of gas upon

asphalt pavements, admitted that he examined and inspected the pavement at least ten times during that period, and made repairs under said contracts in 1899, 1900, 1901, and the spring of 1902. As previously stated, on January 14, 1902, he wrote the Commissioners that the defective portions of the street were "almost entirely confined to the portions occupied by the temporary tracks during the reconstruction of the railway in 1898."

When the District made the repairs to said pavement, it was found that illuminating gas had permeated quite a portion of it. Other portions, however, that were apparently free from gas, were in exactly the same condition. It is not disputed that the pavement was in a very bad condition, and that its disintegration had caused holes to appear over practically its entire surface from 31st to 36th streets. It is also not disputed that the pavement should have been in good condition at the end of the guaranty period. Considerable expert testimony was introduced by both sides, from which it appears that illuminating gas, if it escapes in any considerable amount, will soften an asphalt pavement and render it more susceptible to the action of moisture and surface wear. It also appears, from the testimony of these witnesses, that this fact had been known for many years prior to the dates of these contracts, and that said asphalt company had had similar experiences in other cities. It also appears that the pavement called for by and laid under these contracts is not impervious to moisture. In other words, that an abnormal amount of moisture in the soil would be liable to seep up through, disintegrate, and destroy such a pavement. From the testimony of all the witnesses it is reasonably certain that the disintegration of this pavement was caused by the combined action of water seeping through its base, and by illuminating gas which undoubtedly escaped from the gas mains under said pavement. It is difficult to determine whether water or gas first attacked the pavement, but, under the view we take of the case, that point is not material.

The contention in the original bill, that damage was done by the laying of temporary railway tracks, was practically

abandoned in the argument at bar. The only witness who testified in behalf of the company on this point was its superintendent, Richards. In his direct examination he was asked whether, at the time these tracks were laid, "he observed any injury to the pavement resulting therefrom;" and he replied that he did not, but that he wrote the Commissioners in anticipation of injury that might develop. He testified that large spikes were used by the traction company in laying the tracks, and his theory was that the holes made by these spikes permitted surface water to enter and affect the pavement. To meet this testimony the District offered several witnesses, the first being its inspector of asphalt and cements, who testified that immediately after the removal of the temporary tracks, in 1898, he inspected the pavement with Mr. Richards, the superintendent of the asphalt company, and made a report thereon in writing. The inspector said he discovered a few impressions and *one* spike hole about 1 inch in diameter, but that the defects were too small and insignificant to call for repairs. The contractor who laid the temporary tracks in question testified that practically no spikes were used in laying said tracks; "that the rails were bolted in the joint plates, and a tie rod placed every 15 feet," which enabled them to lay the track loosely upon the pavement. The foreman in charge of the men who laid said temporary tracks testified that the rails were bolted with temporary track or plowshare flatheaded bolts, which did not extend into the pavement, and that the use of the spikes had been abandoned prior to the laying of this track. Another witness, who was assistant engineer for the railway company at the time this track was laid, corroborated the testimony already given.

*Mr. A. S. Worthington* and *Mr. Charles L. Frailey* for the *James Francis Smith,* Assistant, for the appellants.

*Mr. A. S. Worthington* and *Mr. Charles L. Frailey* for the appellees.

Mr. Justice ROBB delivered the opinion of the Court:

In view of the fact that the testimony shows that the laying of temporary tracks on asphalt pavements is not at all unusual, and in view of the showing that no damage was done the pavement on this occasion, this allegation in the bill may be put out of view.

The question to be determined, therefore, is whether the District is to be held liable for the damage done said pavement by the escape of illuminating gas. It is settled doctrine that, where a party by his own contract creates a duty or obligation of possible fulfilment, he must make good his undertaking, unless prevented from so doing by the act of God, the law, or the other party. This rule is founded in reason and common sense. A party, if he chooses, may protect himself against contingencies. If he does not, he ought not to be heard to complain when the contingency he should have protected himself against happens, and loss ensues. It frequently occurs that the possibility of the happening of a certain contingency is urged upon the other party as an inducement to him to accede to the favorable terms demanded, but whether this be so or not, in the absence of fraud the law cannot presume that such contingencies were not considered when the contract was entered into. In other words, the law construes the contract the parties signed, and charges the loss to him who therein assumed it.

In *Dermott* v. *Jones* (*Ingle* v. *Jones*) 2 Wall. 1, 17 L. ed. 762, a mason and house builder contracted with Miss Dermott to build a house for her on land which she owned. The house was to be built according to detailed plans and specifications, which were made a part of the contract, which also contained the covenant that Jones would procure and supply all materials requisite for the execution of the work "in all its parts and details, and for the complete finish and fitting for use and occupation of all the houses and buildings, and the several apartments of the house and buildings, to be erected pursuant to the plan of the work described and specified in the said schedule; and that the work, and the several parts and parcels

thereof, shall be executed, finished, and ready for use and occupation" at a day fixed. The house was built according to the specifications, except as modified by Miss Dermott, but owing to a latent defect in the soil the foundation sank, and the building became badly cracked, uninhabitable, and dangerous, and was taken down and rebuilt by Miss Dermott upon a more secure foundation. Jones sued Miss Dermott for the contract price of the building, and she contended that she was entitled to recoup the amount she expended to make the house fit for habitation. Mr. Justice Swayne said:

"The defendant in error insists that all the work he was required to do is set forth in the specifications, and that, having fulfilled his contract in a workmanlike manner, he is not responsible for defects arising from a cause of which he was ignorant, and which he had no agency in producing.

"Without examining the soundness of this proposition, it is sufficient to say that such is not the state of the case. The specifications and the instrument to which they are annexed constitute the contract. They make a common context, and must be construed together. In that instrument the defendant in error made a covenant. That covenant it was his duty to fulfil, and he was bound to do whatever was necessary to its performance. Against the hardship of the case he might have guarded by a provision in the contract. Not having done so, it is not in the power of this court to relieve him. He did not make that part of the building 'fit for use and occupation.' It could not be occupied with safety to the lives of the inmates. It is a well-settled rule of law that, if a party by his contract charge himself with an obligation possible to be performed, he must make it good, unless its performance is rendered impossible by the act of God, the law, or the other party. Unforeseen difficulties, however great, will not excuse him."

This rule was reiterated in *United States* v. *Gleason,* 175 U. S. 602, 44 L. ed. 289, 20 Sup. Ct. Rep. 228.

In the instant case the statute required the District to exact good and sufficient bonds from this contractor, guarantying, among other things, that it would keep this pavement in repair

for a term of five years from the date of the completion of the contract, and provided for the retention of 10 per cent of the cost of the pavement "as an additional security and a guaranty fund to keep the same for said term." The Commissioners inserted this provision in the contract, and, as previously stated, supplemented the same with the provision that no allowance would be made for any unusual difficulties which might arise, "*either affecting the original construction or maintenance of finished work*," and by the further provision "that if any of the pavements laid should, *for any reason whatsoever,* within the period of five years, prove inferior to the best laid in the District prior to July 1, 1886," the contractor, on demand of the Commissioners, should remove and relay the same with new and approved material. It is now contended that the District cannot rely upon this last provision, because it does not appear that the engineer commissioner passed upon the question of inferiority. But the complainant in its bill states that the Commissioners called upon it to repair this pavement, and that the complainant declined to do so *"for the reasons above set forth;"* that is, because the Commissioners had permitted the railway company to lay temporary tracks over the pavement, and because of the action of illuminating gas on said pavement, and that but for these causes "said pavement at the end of said five years' period would have been in perfect condition." It is therefore apparent that, had the District elected to do so, it might have required the relaying, instead of the repair, of this pavement. Certainly the complainant cannot complain because the District waived such right, and merely required the repair of a pavement which the complainant's own testimony shows proved inferior to the best laid prior thereto. A careful reading of the contract and of the statute authorizing and controlling it compels the conclusion that the asphalt company therein obligated itself to construct and maintain this pavement for five years, unless prevented from doing so by the act of God, the law, or the District. The company knew, or should have known, that gas mains were under this street. It knew that escaping illuminating gas would injuriously affect asphalt pavements. It knew,

or should have known, the character of the soil at this point, and the probability that water would seep up through the base which it constructed for this pavement, and that, if water did permeate said base, disintegration of the pavement would ensue. Notwithstanding these things the company constructed the pavement, and at first sought to avoid its obligation to repair on the ground of the laying of the temporary tracks of the railway company, although its own superintendent was compelled to admit that at the time the tracks were laid he could discover no damage occasioned thereby. It was more than five years after the work was done that anyone discovered that illuminating gas had in any way affected the pavement, and this, notwithstanding that the pavement had then been disintegrating for about two years. Surely, under these conditions, to require the District to pay for these repairs would be to utterly disregard the plain obligation of the contract; and this, of course, we cannot do. Had the complainant entertained any doubt as to the meaning of the provision that no allowance would be made for any unusual difficulties which might arise, either affecting the original construction or maintenance of finished work, and as to the meaning of the guaranty provision, it might have insisted upon a provision in the contract absolving it from responsibility for damage to the pavement from the escape of illuminating gas, and from the effect of the water coming up through the base of the pavement. It did not ask for the insertion of either provision, and the District was therefore led into contracting and paying for a pavement, the base of which complainant's own witnesses admit was not impervious to moisture, a pavement which, as experience demonstrated, was susceptible to the action of gas. It is hardly necessary to observe that the District would not have entered into the contract at all but for the undertaking of the complainant that the pavement would be kept in repair for the period required by the statute.

The decree must be reversed, with costs, and the cause remanded, with direction to enter a decree in conformity with this opinion.                                *Reversed.*